UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MARCIA WALKER,

               Plaintiff,                                    Hon. Paul L. Maloney

v.                                            Case No. 1:11-CV-375

COMMISSIONER OF SOCIAL
SECURITY,

               Defendant.

_____/


## <u>REPORT AND RECOMMENDATION</u>

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim

for Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act.  Section

405(g) limits the Court to a review of the administrative record, and provides that if the

Commissioner's decision is supported by substantial evidence, it shall be conclusive.  Pursuant to

28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings

of fact and recommendations for disposition of social security appeals, the undersigned recommends

that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

2

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.


## PROCEDURAL POSTURE

Plaintiff first applied for disability benefits on January 12, 1995, alleging that she had been disabled since January 29, 1991.  (Tr. 737).  Plaintiff's claim was denied initially and upon reconsideration.  (Tr. 737).  Following an administrative hearing, ALJ Douglas Johnson also denied Plaintiff's claim, a determination that was affirmed by the Appeals Council.  (Tr. 54-74, 390-91, 737).  Plaintiff filed a second application for benefits on January 28, 1999, alleging disability as of January 23, 1998.  (Tr. 737).  This claim was denied initially, a determination which Plaintiff did not pursue further.  (Tr. 737).

Plaintiff filed another application for benefits on January 20, 2000, alleging that she was disabled as of September 23, 1998, due to chronic demyelinating polyneuropathy, multiple entrapment neuropathy, bilateral upper extremity polyneuropathy, depression, carpal tunnel syndrome, and diabetes.  (Tr. 106-08, 117, 737, 877).  Plaintiff's claim was denied initially after which Plaintiff requested a hearing before an ALJ.  (Tr. 737).  Plaintiff later amended her alleged disability onset date to February 21, 2001.  (Tr. 115).  Following a hearing, ALJ Alan Diodore denied Plaintiff's application in an opinion dated March 29, 2002.  (Tr. 18-27).  The Appeals Council declined to review this determination.  (Tr. 6-8, 737).

Plaintiff later initiated separate actions in this Court appealing the two ALJ decisions denying her claims.  (Tr. 737-38).  These two cases were subsequently consolidated.  (Tr. 763).  On

3

January 4, 2007, the Honorable Hugh W. Brenneman recommended that the matter be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) on the following grounds: (1) ALJ Johnson failed to articulate a sufficient basis for rejecting the opinion of one of Plaintiff's treating physicians, and (2) ALJ Diodore's conclusion at step 5 of the sequential analysis that there existed a significant number of jobs that Plaintiff could perform despite her limitations was not supported by substantial evidence. (Tr. 762-78). This recommendation was adopted by the Honorable Gordon J. Quist on January 31, 2007. (Tr. 761). Accordingly, the Appeals Council subsequently remanded the matter to an ALJ for "further proceedings." (Tr. 760).

On January 2, 2008, Plaintiff appeared before ALJ William King, Jr., with testimony being offered by Plaintiff and vocational expert, David Holwerda. (Tr. 1174-1247). In a written decision dated March 6, 2008, the ALJ determined that Plaintiff was not disabled. (Tr. 737-57). Plaintiff later appealed this determination to the Appeals Council, but because her appeal was untimely, ALJ King's decision became the Commissioner's final decision in the matter. (Tr. 686-88). On April 14, 2011, Plaintiff initiated the present action pursuant to 42 U.S.C. § 405(g), seeking judicial review of ALJ King's decision.

Plaintiff was 36 years of age as of her amended disability onset date of February 21, 2001. (Tr. 75, 115). She successfully completed high and attended one year of college, but has no past relevant work experience. (Tr. 123, 755 1179).

## RELEVANT MEDICAL HISTORY

In November 1994 and March 1995, Plaintiff underwent surgery to treat carpal tunnel syndrome of her right hand and left hand respectively. (Tr. 171).

4

On April 16, 1997, Dr. W. van Houten completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 637-45). Determining that Plaintiff suffered from dysthymic disorder, post-traumatic stress disorder, and substance abuse, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders), Section 12.06 (Anxiety-Related Disorders), and Section 12.09 (Substance Addiction Disorders) of the Listing of Impairments. (Tr. 639-43). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for these particular Listings. (Tr. 644). Specifically, the doctor concluded that Plaintiff experienced slight restrictions in the activities of daily living, slight difficulties in maintaining social functioning, seldom experienced deficiencies of concentration, persistence or pace, and never experienced episodes of deterioration or decompensation in work or work-like settings. (Tr. 644).

Dr. van Houten also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 633-36). Plaintiff's abilities were characterized as "moderately limited" in four categories. (Tr. 633-34). With respect to the remaining 16 categories, however, the doctor reported that Plaintiff was "not significantly limited." (Tr. 633-34).

Treatment notes dated December 31, 1999, reveal that Plaintiff was experiencing "abdominal pain" precipitated by her excessive use of alcohol. (Tr. 175). Plaintiff reported that "she has now cut down to where she is only drinking a 12-pack per day." (Tr. 175). Plaintiff was instructed to "stop drinking alcohol and go on a clear liquid diet to give her stomach a rest." (Tr. 175).

5

On March 14, 2000, Plaintiff was examined by Dr. Julia Hall.  (Tr. 170).  Plaintiff reported that she was experiencing "bilateral hand pain."  (Tr. 170).  Plaintiff's "handgrip [was] 4 to 5/5 bilaterally."  (Tr. 170).  Plaintiff also "freely admits to several drinks per day and says this is how she deals with her depression and PTSD and the pain in her hand."  (Tr. 170).  The doctor observed that Plaintiff was "very casual about her alcohol abuse and does not seem particularly worried about it."  (Tr. 170).

Treatment notes dated April 18, 2000, reveal that Plaintiff "has a negative Tinel's[1] and a negative Phelan's sign."[2]  (Tr. 167).  Plaintiff also exhibited "a full range of motion of the neck" with "no palpable abnormalities."  (Tr. 167).  Plaintiff exhibited "decreased range of movement" of the left shoulder, but "full range of movement" of the right shoulder.  (Tr. 167).  Plaintiff also reported that she "still drinks about every three to four days."  (Tr. 167).  Plaintiff also reported that "she does not want any treatment including medical for her depression" as she "is working it out amongst herself."  (Tr. 167).  Plaintiff was advised that "her alcohol abuse could be causing her some peripheral neuropathy."  (Tr. 167).

X-rays of Plaintiff's cervical spine, taken on June 7, 2000, revealed "minimal spurring along the anterior/superior margin of C5 and C6."  (Tr. 953).  The same day, Plaintiff participated

---

[1]  Tinel's test (or Tinel's sign) is performed to determine the presence of carpal tunnel syndrome.  *See* Tinel's and Phalen's Tests, available at http://www.carpal-tunnel-symptoms.com/tinels-and-phalens-tests.html (last visited on August 16, 2012).  Tinel's test is performed by tapping over the carpal tunnel area of the wrist with the palm up.  A positive test causes tingling or paresthesia, and sometimes even a "shock type sensation," in the median nerve distribution.  *Id.*

[2]  Phalen's test is performed to determine the presence of carpal tunnel syndrome.  *See* Tinel's and Phalen's Tests, available at http://www.carpal-tunnel-symptoms.com/tinels-and-phalens-tests.html (last visited on August 16, 2012).  Phalen's test is performed by bending the patient's wrists downwards as far as they will comfortably go and pushing the backs of the hands together.  The patient should hold this position for one minute.  A positive test is indicated by numbness or tingling along the median nerve distribution.  *Id.*

in an MRI examination of her cervical spine the results of which revealed "no disc herniation. . .minimal spondylosis" and "borderline" spinal stenosis.  (Tr. 185).

On July 18, 2000, Plaintiff was examined by Dr. Ivan Landan.  (Tr. 207-09).  Plaintiff reported that she was experiencing "bilateral wrist and hand numbness and pain," as well as "neck and shoulder pain."  (Tr. 207).  The results of a neurologic examination revealed that Plaintiff was experiencing "decreased ice sensation in a stocking glove distribution."  (Tr. 208).  The doctor concluded that Plaintiff was experiencing peripheral neuropathy caused by her diabetes and alcoholism.  (Tr. 208).  With respect to Plaintiff's reports of shoulder and neck pain, the doctor concluded that "there is no evidence of spinal involvement" and that Plaintiff's symptoms were "musculoskeletal not neuropathic."  (Tr. 208).

On September 12, 2000, Dr. H. C. Tien completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations.  (Tr. 229-38).  Determining that Plaintiff suffered from a disturbance of mood, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders) of the Listing of Impairments.  (Tr. 231-35).  The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for this particular Listing.  (Tr. 236).  Specifically, the doctor concluded that Plaintiff experienced slight restrictions in the activities of daily living, slight difficulties in maintaining social functioning, often experienced deficiencies of concentration, persistence or pace, and never experienced episodes of deterioration or decompensation in work or work-like settings.  (Tr. 236).

Dr. Tien also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation.  (Tr.

225-27).  Plaintiff's abilities were characterized as "moderately limited" in three categories.  (Tr. 225-26).  With respect to the remaining 17 categories, however, the doctor reported that Plaintiff was "not significantly limited."  (Tr. 225-26).  The doctor concluded that Plaintiff was capable of performing "a wide range of simple, unskilled tasks, in [a] regular work environment."  (Tr. 227).

A February 5, 2001 examination of Plaintiff's wrists revealed "mild tenderness," but Phelan's test and Tinel's test were both negative.  (Tr. 245).

On October 29, 2001, Plaintiff was examined by Dr. Martin Russo.  (Tr. 301).  Plaintiff reported that "she worked one day at a job and felt something snap in her back" and had since been experiencing neck and back pain.  (Tr. 301).  Plaintiff reported that she was occasionally taking Motrin, but "has not been using any exercises, ice or heat."  (Tr. 301).  The results of a physical examination revealed the following:

> She is obese in mild distress but she has normal gait and station and is able to ambulate on her toes and heels without difficulty.  She has extremely limited flexion but can extend at the waist and she is able to rotate at the waist without limitations.  She has tenderness with palpation of the thoracic spinous processes but is diffusely tender throughout her entire back.  There is no specific area of tenderness.  She does have muscle tension along the paraspinous muscles more so on the left than on the right in the thoracic area.  She has full range of motion of the neck and upper extremities.  Strong and equal grip strength bilaterally, negative straight leg raises.

(Tr. 301).  Plaintiff was diagnosed with back pain for which she was prescribed Naprosyn and Flexeril.  (Tr. 301).  Plaintiff was also instructed "to avoid alcohol" and "to use heat."  (Tr. 301).

Treatment notes dated January 7, 2002, indicate that Plaintiff "is Type 2 diabetic, but has been fairly well controlled on diet and exercise."  (Tr. 307).

Treatment notes dated March 21, 2005, indicate that Plaintiff was using alcohol and marijuana, but "has not been checking her blood sugar as instructed" and had not taken her prescribed medication for approximately one month. (Tr. 996). When asked about her drug use, Plaintiff reported that she was using marijuana "freq[uently]" and had "no desire to quit." (Tr. 996).

Treatment notes dated February 24, 2006, indicate that Plaintiff continues to use alcohol and marijuana. (Tr. 975).

On March 3, 2006, Plaintiff participated in an echocardiogram examination the results of which were "essentially normal...except for mild pulmonic valve regurgitation." (Tr. 1019-21). Treatment notes dated March 6, 2006, reveal "no evidence of diabetic retinopathy." (Tr. 1018). On March 21, 2006, Plaintiff participated in a deep venous ultrasound examination of her left lower extremity the results of which were "negative." (Tr. 1017).

Treatment notes dated March 7, 2007, indicate that Plaintiff "is drinking alcohol again regularly." (Tr. 1078). Plaintiff was reminded that "alcohol is toxic to [her] nerves." (Tr. 1078).

On May 2, 2007, Plaintiff was examined by Psychiatrist Dr. Zia Kahn. (Tr. 1042-44). Plaintiff reported that she was disabled because she "was depressed." (Tr. 1042). Plaintiff reported that she previously supported herself "with the SSI check that she was receiving for her 18-year-old son who was diagnosed with bipolar mood disorder," but "now that he is incarcerated they don't have that funding anymore thus basically she has no means of support." (Tr. 1042). Plaintiff reported that she smoked "about 10-15" marijuana cigarettes daily. (Tr. 1042). Plaintiff reported that "this helps her with her body aches and pains," but as the doctor observed, Plaintiff "curiously enough is not on any medications for pain management." (Tr. 1042). Plaintiff reported that she "is anxious all the time," that her concentration is "bad," that her nerves are "shattered," and that she

9

"feels helpless and hopeless regarding the future." (Tr. 1042). Plaintiff also reported that she "gets panic attacks where she feels that she is going to lose control or something bad is going to happen." (Tr. 1042). Plaintiff also reported that she "hears voices...[which] sometimes tell her to crash her car." (Tr. 1042). Dr. Kahn observed that this was the first instance in which Plaintiff reported experiencing hallucinations or expressing suicidal ideations. (Tr. 1042). The doctor concluded that Plaintiff "was making up symptoms as she went along." (Tr. 1042). The results of a mental status examination revealed the following:

> She is rather nicely dressed with good attention to her hygiene and grooming. There is no evidence of any psychomotor disturbance. Her speech is normal rate and tone. Her mood according to her is depressed. Her affect however seems to be somewhat indifferent and blase. She was not rude or discourteous but talked with me while her face was turned the other way and once in awhile she would swivel in her chair back and forth thus conveying the impression of somewhat of a discongruent affect compared to what she's describing her mood to be. She admitted that she was hearing voices telling her to crash her car into traffic, which the first that any of us have heard of this. Her presentation certainly did not appear to be one of that of anybody who was having any hallucinations whatsoever. She did not appear to be distressed or anxious. She denied any acute suicidal or homicidal ideations. Her cognitive functioning is intact.

(Tr. 1043). Plaintiff was diagnosed with mood disorder and cannabis dependence. (Tr. 1043). Her GAF score was rated as 56.[3] (Tr. 1043).

On June 20, 2007, Plaintiff was examined by Psychologist Dennis Mulder, Ed.D. (Tr. 930-34). Plaintiff reported that she was depressed and "has no interests, motivation, or enjoyment in life." (Tr. 930). Plaintiff reported that she "daily and constantly" experiences pain in her hands,

---

[3] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 56 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

lower back, neck, shoulders, and feet. (Tr. 930). Plaintiff reported that "at its worst" her pain rates 10/10 and "at its least" her pain rates 8/10. (Tr. 930). Plaintiff reported that on a typical day she watches television in the morning, goes for a walk or sits outside in the afternoon, and watches television in the evening. (Tr. 932). Plaintiff also reported that she vacuums and washes laundry. (Tr. 932). Plaintiff exhibited "no posture or gait problems." (Tr. 932). The results of a mental status examination were unremarkable. (Tr. 932-33). Dr. Mulder did, however, observe that Plaintiff "may exaggerate the degree of her psychological pathology perhaps in an effort to excuse herself from certain duties or responsibilities." (Tr. 934). The doctor also observed that there "appears to be significant interrelatedness between her psychological complaints and her physical complaints." (Tr. 934). Plaintiff was diagnosed with dysthymia, panic disorder without agoraphobia, and history of alcohol and marijuana abuse in short term remission. (Tr. 934).

Dr. Mulder also completed a report concerning Plaintiff's ability to perform mental work related activities. (Tr. 935-37). The doctor reported that Plaintiff experienced no limitations in her ability to understand, remember, and carry out "simply instructions." (Tr. 935). The doctor reported that Plaintiff experienced "mild" limitations in her "ability to make judgments on simply work-related decisions." (Tr. 935). Finally, the doctor observed that Plaintiff experienced "moderate" limitations in the following areas: (1) understand and remember complex instructions, (2) carry out complex instructions, (3) make judgments on complex work-related decisions, (4) interact appropriately with the public, supervisors, and coworkers, and (5) respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 935-36).

On June 26, 2007, Plaintiff was examined by Dr. Donald Sheill. (Tr. 938-49). Plaintiff reported that she was disabled due to "upper and lower extremity symptoms, CTS,

11

polyneuropathy, back and right shoulder pain, asthma, hypertension, depression, memory loss, short-term attention span, and PTSD." (Tr. 948). The results of a physical examination revealed the following:

> Lungs clear throughout. The heart rhythm is regular with no murmur or gallop. The abdomen is soft, benign, and non tender with no organomegaly or mass. The extremities are symmetric with no atrophy or edema. Inspection of the hands reveals no atrophy, swelling, or deformity. Healed CTS scars are noted and there is no abnormality of color, temperature, or moisture. Sensory is full. Phelan's and Tinel's is negative. The forearms are unremarkable. Both shoulders are notable for limited motion although the right appears perhaps more uncomfortable. There is no tenderness. The tone is adequate. Pain behaviors appear excessive and obscure the shoulder exam findings. Inspection of the low back is unremarkable and SLR is non specific, not causing potential radicular symptoms. The palpation is unremarkable. She has adequate strength walking on heels and toes as well as squatting and recovering. The lower extremities are free of gross deformity, swelling, or stasis changes. Sensory is full throughout the hands and feet. The tandem gait was mildly unsteady. The patient was alert and oriented times three. She did exhibit a lot of pain behaviors that appeared out of proportion to the circumstances. She did not appear outwardly sad or anxious and her eye contact was adequate.

(Tr. 949).

Dr. Scheill also completed a report regarding Plaintiff's ability to perform physical work-related activities. (Tr. 942-47). The doctor reported that Plaintiff can "continuously" lift up to 10 pounds, "frequently" lift 11 to 20 pounds, "occasionally" lift 21 to 50 pounds, but can never lift more than 50 pounds. (Tr. 942). The doctor reported that Plaintiff can "continuously" carry up to 10 pounds, "occasionally" carry 11 to 20 pounds, but can never carry more than 20 pounds. (Tr. 942). The doctor reported that Plaintiff can sit for four hours continuously without interruption and can stand and walk for two hours each continuously without interruption. (Tr. 943). The doctor

reported that during an eight hour work day, Plaintiff can sit for eight hours, stand for four hours, and walk for four hours. (Tr. 943). With respect to Plaintiff's ability to use her hands to perform work activities, the doctor reported that Plaintiff can never perform overhead reaching activities, but can occasionally perform all other reaching activities with her right and left hand. (Tr. 944). The doctor further reported that Plaintiff can continuously perform handling, fingering, and feeling activities with her right and left hand. (Tr. 944). The doctor reported that Plaintiff can continuously operate foot controls with her right and left foot. (Tr. 944). As for postural activities, the doctor reported that Plaintiff can never climb ladders or scaffolds, but can occasionally balance and climb stairs and ramps, and can frequently stoop, kneel, crouch, and crawl. (Tr. 945).

X-rays of Plaintiff's right shoulder, taken on June 30, 2007, revealed "no acute abnormality." (Tr. 1132). X-rays of Plaintiff's lumbosacral spine, taken on July 11, 2007, revealed that "lumbar alignment remains anatomic" and "disc spaces and body heights are well maintained." (Tr. 1131). There was evidence of "very mild early degenerative changes of the lumbar spine," but "no acute bony abnormality." (Tr. 1131). X-rays of Plaintiff's chest, taken on July 15, 2007, revealed "normal heart size" and "no acute pulmonary disease." (Tr. 1127).

On October 9, 2007, Plaintiff participated in a bilateral lower extremity deep venous thrombosis ultrasound examination the results of which were "negative." (Tr. 723). On December 28, 2007, Plaintiff participated in an MRI examination of her brain the results of which revealed "no acute intracranial abnormality." (Tr. 1172-73). Treatment notes dated January 16, 2008, reveal that Plaintiff "is doing much better back on the Lyrica" and "her myalgias are improved." (Tr. 1159). Plaintiff reported that she was still using alcohol and marijuana. (Tr. 1159). Treatment notes dated January 16, 2008, revealed "no evidence of diabetic retinopathy." (Tr. 1171). On January 31, 2008,

13

Plaintiff participated in an EMG examination the results of which revealed "evidence consistent with sensory motor polyneuropathy involving the upper and lower limbs." (Tr. 1167).

At the administrative hearing, Plaintiff reported that she was experiencing weakness, tingling, and burning in her hands and forearms which "sometimes" causes her to "drop...stuff." (Tr. 1187-89). Plaintiff reported that she has experienced this level of impairment "since about 1994-1995 when I got the surgeries." (Tr. 1189). When asked if she was taking any prescription medication, Plaintiff indicated that she began taking Lyrica about two months previous. (Tr. 1191). Plaintiff reported that since beginning Lyrica, her shoulders, neck, hands, and feet have all been "getting better." (Tr. 1191-92). Plaintiff reported that she was experiencing low back pain which radiated into her lower extremities. (Tr. 1192-93). Plaintiff also reported that as a result of her diabetes she experienced numbness in her feet as well as worsening blurry vision. (Tr. 1199-1202). Plaintiff also reported that she experiences occasional panic attacks as well as nervousness and shakiness. (Tr. 1206-08).

Plaintiff reported that she could stand for "about 10 minutes" before needed to sit down and that she could sit for "about 5 or 10 minutes" before she would need to stand up. (Tr. 1210). Plaintiff also reported that she could not go more than "about 3 to 4 hours" without laying down. (Tr. 1211). Plaintiff reported that she could not lift more than one gallon of milk and had been so limited for "years." (Tr. 1211). Plaintiff reported that she was able to ride a bike, but experienced difficulty with her balance when walking. (Tr. 1212-13). Plaintiff also reported that she continues to use marijuana "almost daily." (Tr. 1185).

14

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[4]  If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.  While the burden of proof shifts to the Commissioner at step five of the sequential evaluation process, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*,

---

[4] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) diabetes mellitus with possible peripheral neuropathy; (2) degenerative disc disease of the lumbar and cervical spine; (3) obesity; (4) alcohol and marijuana abuse disorder; (5) asthma; (6) a depressive disorder; and (7) a panic disorder, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 741-45).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform work activities subject to the following limitations: (1) she can lift up to 50 pounds occasionally and up to 20 pounds frequently; (2) she can carry up to 20 pounds occasionally and up to 10 pounds frequently; (3) she can stand and/or walk for four hours total during an 8-hour workday; (4) she can sit for 8 hours total during an 8-hour workday; (5) she can preform frequent handling activities with both upper extremities; (6) she cannot perform overhead reaching activities with her upper extremities; (7) she can occasionally use her upper extremities to reach (other than overhead) and perform pushing/pulling activities; (8) she can occasionally climb stairs and balance; (9) she can frequently stoop, kneel, crouch, and crawl; (10) she can frequently be exposed to moving machinery, heights, humidity, wetness, pulmonary irritants, and temperature extremes; (11) she can only perform work tasks that can be learned in less than 30 days; and (12) she can only perform work that involves no more than simple work-related decisions, few work place changes, no interaction with the general public, and only occasional interaction with co-workers and supervisors. (Tr. 745).

16

The ALJ determined that Plaintiff had no past relevant work experience, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert David Holwerda.

The vocational expert testified that there existed approximately 34,800 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 1231-42). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). The ALJ concluded, therefore, that Plaintiff was not entitled to benefits.

a.     The ALJ Properly Evaluated the Medical Evidence

On November 12, 1996, Plaintiff's counsel deposed Dr. William Kirchhaine regarding Plaintiff's impairments and limitations. (Tr. 592-605). The doctor testified that Plaintiff

was unable to lift more than five pounds or perform any type of repetitive activity with her upper extremities due to her carpal tunnel syndrome. (Tr. 600-01). Dr. Kirchhaine testified that Plaintiff was "very weak in both hands and has a very weak grip strength." (Tr. 600). The doctor testified that Plaintiff was unable to perform work that required fine coordination skills. (Tr. 601-02). The doctor testified that because of the neck pain Plaintiff experiences, she must lay down throughout the day. (Tr. 602-03). The doctor also testified that Plaintiff's emotional difficulties exacerbated her physical symptoms. (Tr. 602-04). Plaintiff argues that because Dr. Kirchhaine was her treating physician, the ALJ was obligated to afford controlling weight to his opinions.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*,

18

839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544. The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007). Instead, the record must reflect that the ALJ considered those factors relevant to her assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

The ALJ articulated several reasons for discounting Dr. Kirchhaine's opinion. (Tr. 752). While Dr. Kirchhaine attributed much of Plaintiff's physical symptomatology to her emotional impairments, as the ALJ observed, Dr. Kirchhaine is not a psychologist or psychiatrist. Moreover, as the ALJ further recognized, Dr. Kirchhaine was unaware that subsequent mental health professionals determined that Plaintiff was exaggerating her symptoms. Even Dr. Kirchhaine, in his contemporaneous treatment notes, observed that Plaintiff was focused on obtaining disability benefits and was willing to exaggerate her symptoms to obtain such. (Tr. 565).

While Dr. Kirchhaine based his opinions on the belief that Plaintiff was experiencing weak grip strength, carpal tunnel syndrome, and compression of the ulnar nerve, the medical evidence reveals otherwise. As the ALJ recognized, the record does not indicate that Plaintiff has

19

suffered compression of the ulnar nerve.  Moreover, x-rays and MRIs of Plaintiff's spine have revealed only minimal degenerative changes which are inconsistent with the doctor's opinion of extreme limitation.  (Tr. 185, 208, 1131).  Testing performed several years after Dr. Kirchhaine offered his opinion (and several years after Plaintiff's carpal tunnel surgeries) revealed that Plaintiff possessed good grip strength with no evidence of continued carpal tunnel or related difficulties.  (Tr. 167, 170, 245, 301, 949).  As for Plaintiff's other physical symptoms, the medical record contains no objective evidence that Plaintiff suffers from an impairment that is disabling to the extent alleged. In fact, the record indicates that on the rare occasions when Plaintiff has followed her care provider's instructions and taken her medication as prescribed, her physical symptoms are greatly improved. (Tr. 307, 1159, 1191-92).  In sum, the ALJ's rationale for according less than controlling weight to Dr. Kirchhaine's opinion is supported by substantial evidence.

b.      The ALJ Improperly Discounted Plaintiff's Subjective Allegations

As noted above, Plaintiff testified at the administrative hearing that she was impaired to an extent far greater than that recognized by the ALJ.  Plaintiff argues that the ALJ erred by failing to accord controlling weight to her subjective allegations.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added); *see also*, *Grecol v. Halter*, 46 Fed. Appx. 773, 775 (6th Cir., Aug. 29, 2002) (same).  As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled."  20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th

Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)) *Hash v. Commissioner of Social Security*, 309 Fed.

Appx. 981, 989 (6th Cir., Feb. 10, 2009).  Instead, as the Sixth Circuit has established, a claimant's

assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an
> underlying medical condition.  If there is, we then examine: (1)
> whether objective medical evidence confirms the severity of the
> alleged pain arising from the condition; or (2) whether the objectively
> established medical condition is of such a severity that it can
> reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted).  This standard is often referred to as the *Duncan*

standard.  *See Workman v. Commissioner of Social Security*, 105 Fed. Appx. 794, 801 (6th Cir., July

29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may

support a finding of disability only where objective medical evidence confirms the severity of the

alleged symptoms."  *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)).

However, where the objective medical evidence fails to confirm the severity of a claimant's

subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to

resolve the significant conflicts in the administrative record."  *Workman*, 105 Fed. Appx. at 801

(citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be

accorded great weight and deference."  *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d

at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t

is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the

witnesses and weigh and evaluate their testimony").  It is not for this Court to reevaluate such

evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

The ALJ discounted Plaintiff's subjective allegations as such were "not credible" to the extent such were inconsistent with his RFC determination. (Tr. 753). The record reveals that Plaintiff has a significant drug and alcohol problem. While Plaintiff testified at the administrative hearing that she stopped drinking in February 2007, as the ALJ observed, Plaintiff told Dr. Sheill in June 2007, that she last drank alcohol "four weeks ago." (Tr. 948, 1184-85). While Plaintiff has alleged that she experiences debilitating neck and back pain, as the ALJ recognized, the objective medical evidence, as well as the results of numerous physical examinations simply do not support Plaintiff's allegations. Moreover, the record contains ample evidence that Plaintiff has exaggerated her symptoms in an attempt to obtain disability benefits. Likewise, the medical record does not support Plaintiff's allegations that she suffers from debilitating carpal tunnel syndrome. As detailed above, every indication is that Plaintiff's carpal tunnel surgeries were both quite successful.

In sum, the ALJ's decision to discount Plaintiff's subjective allegations is supported by substantial evidence. *See Norris v. Commissioner of Social Security*, 2012 WL 372986 at *4-5 (6th Cir., Feb. 7, 2012) (where the ALJ "did not misconstrue facts in the record or overlook other significant evidence. . .and identified specific facts supported by the record" which to "a reasonable mind" would "cast doubt on" a claimant's subjective allegations, the ALJ's decision to discount the claimant's credibility is not in error).

c.      The ALJ Properly Relied on the Vocational Expert's Testimony

Finally, Plaintiff asserts that the ALJ relied upon the response to an inaccurate hypothetical question.  While the ALJ may satisfy his burden through the use of hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments.  *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996).

The hypothetical question which the ALJ posed to the vocational expert simply asked whether there existed jobs which an individual could perform consistent with Plaintiff's RFC, to which the vocational expert indicated that there existed approximately 34,800 such jobs.  Plaintiff faults the ALJ for relying on the vocational expert's testimony because, according to Plaintiff, the hypothetical questions posed to the vocational expert "describe a person less limited than the ALJ found Plaintiff to be."  Specifically, Plaintiff asserts that while the ALJ found that Plaintiff could not perform overhead reaching, his hypothetical question to the vocational expert did not include any such limitation.  Plaintiff also argues that while the ALJ imposed certain environmental limitations on Plaintiff, the ALJ's hypothetical question to the vocational expert contained no such limitation.  A review of the record, however, reveals Plaintiff's argument to be without merit.  While the ALJ posed several hypothetical questions to the vocational expert, the hypothetical which articulated the limitations which the ALJ ultimately incorporated into his RFC determination, included a limitation of "no overhead reaching" and, likewise, contained the same environmental limitations which the ALJ incorporated into his RFC determination.

In sum, the ALJ's RFC determination is supported by substantial evidence and there was nothing improper or incomplete about the hypothetical questions the ALJ posed to the

23

vocational expert.  The Court concludes, therefore, that the ALJ properly relied upon the vocational expert's testimony.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence.  Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  August 23, 2012                       /s/ Ellen S. Carmody
                                             ELLEN S. CARMODY
                                             United States Magistrate Judge